(C. D. 1775)

METALLIZING ENGINEERING Co., INC. *v.* UNITED STATES

## United States Customs Court, Second Division

(Decided April 19, 1956)

*John D. Rode* for the plaintiff.

*George S. Leonard*, Acting Assistant Attorney General (*Alfred A. Taylor, Jr.*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: The collector of customs classified an importation of so-called wire control and straightener units as articles in chief value of metal and assessed duty thereon at the rate of 22½ per centum ad valorem pursuant to the provisions of paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

The protest relates to two entries, each of which included enough parts to comprise 60 sets, respectively, of wire control units, each set having some 24 different parts, such as lock washers, bolts, sliders, spiders, springs, handwheels, shafts, thumbscrews, brake blocks, et cetera.

By its protest, plaintiff, importer, contends that said merchandise should be classified as machines or parts thereof within the provisions of paragraph 372 of said act (19 U. S. C. § 1001, par. 372), as modified by the Torquay Protocol to said trade agreement (86 Treas. Dec. 121, T. D. 52739), and subjected to duty at the rate of 13¾ per centum ad valorem.

The pertinent text of the competing provisions is here set forth—

[397] Articles or wares not specially provided for, whether partly or wholly manufactured:

\* \* \* \* \* \* \*

Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

\* \* \* \* \* \* \*

Other \* \* \*_____ 22½% ad val.

[372] Machines, finished or unfinished, not specially provided for:

Calculating machines specially constructed for multiplying and dividing \* \* \*

\* \* \* \* \* \* \*

Other \* \* \*_____ 13¾% ad val.

[372] Parts, not specially provided for, wholly or in chief value of metal or porcelain, of any article provided for in any item 372 in this Part:

Parts of sewing machines_____ 10% ad val.

Other_____ The rate for the article of which they are parts.

At the trial, but one witness was called, who testified on behalf of the plaintiff and through whom the following exhibits were introduced into evidence:

Exhibit 1—photograph illustrating the component parts assembled into a complete unit comprising the imported mechanism.

Exhibit 2—pamphlet illustrating the construction of exhibit 1.

Exhibit 3—piece of steel wire, three-sixteenths of 1 inch in diameter, cut from a long coil of wire which is used in conjunction with the imported product.

Plaintiff's witness, George Lufkin, secretary-treasurer of the importing corporation since 1933, stated that the corporation manufactures metal spring equipment; that he is familiar with the subject merchandise represented by exhibit 1; and that it is used only in conjunction with a metal-spray machine which his concern manufactures. The function and purpose of a metal-spray machine, as disclosed by the record, are to take metal in wire form and run it through the machine utilizing oxygen, acetylene, and air, which melts the wire, atomizes it, and shoots it out as a hot spray, in this way applying metallic coatings to objects which are being worked on.

In order to prepare wire for use in the metal-spraying machine, the imported equipment is employed to straighten the wire within thousandths of an inch throughout the material. The device represented by exhibit 1 holds a coil of wire and straightens the wire to a point where it can be fed into a metallizing gun. Exhibit 3 has the natural curve of wire when in coils and is typical of wire which is straightened in the device referred to (exhibit 1) before it is fed into the metallizing gun.

The witness described the operation of the device substantially as follows, to quote from the brief of plaintiff:

* * * The device has a round stand on which the coil of wire is placed. The end of the coil is threaded through six rollers which are adjusted until the pressure is such that when you exert a force on the wire itself, by pulling it through the rollers, it straightens it out. Four small rods, adjustable, hold the coil of wire on the stand and keep it from flying off. Tension on the wheel is regulated by adjusting the spring in the center, to get the proper amount of friction so that as the material is drawn off, it will unwind properly and will not have either a drag or what is called an "overrunning effect."

The three twin rollers through which the wire is drawn are adjusted by rotating their axes. After the wire comes out of the rollers it is fed into the metal-spray gun which holds on to the wire and draws it into the gun. The gun is run by air fed into a high speed turbine, which transmits force to small feed rolls on the

gun, which hold the wire and feed it through into a nozzle where it is atomized. The gun pulls the wire out of Exhibit 1 by providing the force necessary to uncoil it through the three sets of rollers. Tension on the other end of the wire is controlled by the spring shown in the center of Exhibit 1 which acts as sort of a governor.

The three sets of rollers exert a force in the opposite direction from the curvature of the wire, and in just the right amount. While the source of the devices' power is outside (i. e. from the gun) the Exhibit transmits power by changing its direction.

Further, the witness testified that the gun, or metal-spraying machine, has the appearance of an oversize revolver, weighing 5 to 6 pounds and having 190 moving parts. Feed rolls in the gun are motivated by a gear mechanism which is run by an air turbine. The metallizing gun is used for converting metal into a fine atomized spray to apply metal onto metal, to restore worn spots. The operator holds the gun in his hand alongside of the imported straightener (exhibit 1), and the wire is fed into the gun through a hole in the rear end thereof, the operator threading it in by hand. Two small rollers exert pressure on the wire and drag it off exhibit 1. Once the mechanism is started, it continues to feed in wire.

It is the contention of plaintiff that the imported wire control unit should be classified for duty purposes either as a machine in itself or as a part of a machine.

Our inquiry will be, first, whether the metallizing gun above described is a machine in the tariff sense, and, secondly, if that question should be answered in the affirmative, whether the wire control unit and straightener parts constitute parts of it in a legal sense.

Many years ago, in *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537, our appellate court indicated that a machine is a mechanical contrivance for utilizing, applying, or modifying energy or force, or for the transmission of motion, citing as references the Standard Dictionary, Webster's New International Dictionary, and Lockwood's Dictionary of Mechanical Engineering Terms. That definition, with certain refinements and appropriate qualifications, has been cited and applied in numerous subsequent cases. See *United States* v. *L. Oppleman, Inc.*, 25 C. C. P. A. (Customs) 168, T. D. 49271, and *United States* v. *J. E. Bernard & Co., Inc.*, 30 C. C. P. A. (Customs) 213, C. A. D. 235.

The undisputed testimony of plaintiff's sole witness descloses that the metallizing gun contains 190 moving parts, and, while these parts are not described in any detail, we do have the positive statement that the motivating force starts as air under high compression, the air being a jet which hits the blade of a turbine, causing it to revolve at 34,000 r. p. m., which is clearly a utilization and application of energy or force.

We are satisfied, upon the uncontroverted testimony of the witness for plaintiff, that the metallizing gun is a machine within the purview of the decisions above cited.

Our next inquiry will be whether or not the wire control and straightener units are parts of said metallizing gun for tariff purposes. In this connection, we have the undisputed testimony of the witness Lufkin that their sole use is in conjunction with the metallizing gun. The mere fact that the gun may be used without the wire control and straightener unit in spraying lead and tin is of no particular consequence. The fact, nevertheless, remains that, when used to melt wire, it is a necessary part of the equipment. Citing *Norma Company of America* v. *United States*, 6 Ct. Cust. Appls. 89, T. D. 35338; *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C. P. A. (Customs) 322, T. D. 46851; and *Antonio Pompeo* v. *United States*, 34 Cust. Ct. 12, C. D. 1669, affirmed in *United States* v. *Antonio Pompeo*, 43 C. C. P. A. (Customs) 9, C. A. D. 602.

Having arrived at the conclusion that the wire control and straightener unit is a necessary and essential part of the metallizing gun when in operation, we find it unnecessary at this time to determine whether or not said unit is, in fact, a machine in itself.

For the foregoing reasons and upon the authorities cited, we sustain the claim of plaintiff that the merchandise in issue should be classified as parts of a machine and subjected to duty at the rate of 13¾ per centum ad valorem in paragraph 372, as modified, *supra*. All other claims are overruled.

Judgment will be entered accordingly.